J-A23024-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| BARBARA A. DAVIS, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| YURY L. BYKOV, INCORRECTLY | : | |
| IDENTIFIED AS YURY I. BYBOV, | : | |
| M.D., VSAS ORTHOPAEDICS, P.C., | : | |
| FORMERLY KNOWN AS VALLEY | : | |
| SPORTS & ARTHRITIS SURGEONS, | : | No. 1194 EDA 2017 |
| P.C. | : | |

Appeal from the Order Entered January 31, 2017
In the Court of Common Pleas of Lehigh County
Civil Division at No.: 2013-C-3960

BEFORE: PANELLA, J., DUBOW, J., and FITZGERALD, J*

MEMORANDUM BY DUBOW, J.:                    **FILED OCTOBER 26, 2017**

In this medical negligence action, Appellant, Barbara A. Davis, appeals

from the Order entering Judgment in favor of Appellees, Yury L. Bykov ("Dr.

Bykov") and VSAS Orthopaedics, P.C., following a jury trial.  After careful

review, we affirm on the basis of the trial court's well-reasoned and

comprehensive Opinion.

We adopt the facts as set forth in the trial court's January 31, 2017

Pa.R.A.P. 1925(a) Opinion.  **See** Trial Court Opinion, dated 1/31/17, at 2-8.

In summary, Appellant fractured her tibia and fibula while dismounting a

horse on December 23, 2011.  Dr. Bykov evaluated Appellant in the

emergency room at Lehigh Valley Hospital, diagnosed her with soft tissue

_____
* Former Justice specially assigned to the Superior Court.

injury and a fractured tibia and fibula, and concluded that she needed immediate surgery. Dr. Bykov performed the surgery and inserted an intramedullary rod inside her tibia bone to stabilize the fracture.

Appellant was discharged from the hospital on December 26, 2011. During follow-up treatment visits, there were numerous complications that resulted in additional surgeries. An X-ray in January 2012 showed that the intramedullary rod inside her tibia bone was no longer holding the fracture in place and displaced through the front of the bone, and she underwent surgery to remove the rod the next day. Dr. Bykov continued to treat Appellant, but a CAT scan in May 2012 showed that there was no healing at the fracture site.

Appellant followed up with another doctor at the Rothman Institute and underwent an additional surgery. Further treatment through 2014 improved Appellant's leg condition and healing. Appellant continues to experience occasional pain in her right leg, and there is significant scarring and a small bump on her leg, with intermittent swelling.

On November 4, 2013, Appellant initiated this medical negligence action by filing a Writ of Summons and then a Complaint on January 10, 2014, along with Certificates of Merit shortly thereafter. On September 29, 2016, this case proceeded to a jury trial.

At trial, Appellant presented expert testimony that Dr. Bykov failed to meet the standard of care because he failed to recognize a new fracture line

in an X-ray in January 2012 and because he failed to recognize that the tibia and fibula had shifted and become displaced. Appellant's expert opined that these failures caused Dr. Bykov to permit Appellant to begin bearing weight when she should not have. This caused the fracture to become more displaced, heal in an improper position, and the bone to poke through the skin. As a result, Appellant needed the placement of an external fixator and additional surgeries, and proper healing was delayed. Dr. Bykov presented expert testimony from Dr. Samir Mehta to contradict these claims and that his care met the standard of care.

Dr. Bykov, an orthopedic trauma surgeon, also testified about his treatment of Appellant. Relevant to the issue on appeal, Dr. Bykov testified, over Appellant's objections, that: (1) he "felt that we did everything appropriate and we did meet the standard of care[;]" (2) he agreed with counsel that he did "bring to bear all [his] education, training, and expertise and [did] so to the best of [his] abilities;" and (3) he did "bring to bear that orthopedic trauma fellowship, [his] experience in dealing with tibia fractures, [his] knowledge of rods and relative stability, and [applied] those concepts to the best of [his] ability as a doctor[.]" N.T. Trial, 9/28/16, at 126, 224.

Appellant objected because this evidence prejudiced her as a result of the trial court essentially permitting Dr. Bykov to testify as to an improper subjective standard of care. The trial court overruled Appellant's objections during trial, but allowed Appellant time to find cases to support her position.

The next day, Appellant again raised the issue, presented supporting case law, and requested a mistrial. The trial court overruled the objections and denied her request for a mistrial.

Both counsel emphasized this point during closing arguments. During the jury charge, the trial court instructed the jury about the objective standard of care in its jury instructions at the end of trial.

On September 29, 2016, the jury returned a defense verdict and concluded that Dr. Bykov was not negligent. Appellant filed a Post-Trial Motion on October 7, 2016. Appellant again argued that the trial court improperly overruled her objections to Dr. Bykov's statements regarding his treatment of Appellant to the best of his abilities. Appellant contended that this testimony improperly suggested an incorrect and subjective standard of care. After briefing and argument, the trial court denied Appellant's Post-Trial Motion in an Opinion filed on January 31, 2017. The trial court entered Judgment by Praecipe on March 2, 2017.

Appellant filed a timely Notice of Appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant presents one issue for our review:

Whether [Appellant's] Motion for Post-Trial Relief should have been granted and a new trial ordered when [Dr.] Bykov's testimony was permitted to be heard by the jury, above objection, during trial on September 28, 2016, regarding the improper standard of care in a medical malpractice case, thereby prejudicing [Appellant], who bears the burden of proof of her claims against [Appellees]?

- 4 -

Appellant's Brief at 4.

"Our standard of review when faced with an appeal from the trial court's denial of a motion for a new trial is whether the trial court clearly and palpably committed an error of law that controlled the outcome of the case or constituted an abuse of discretion." *Blumer v. Ford Motor Co.*, 20 A.3d 1222, 1226 (Pa. Super. 2011) (citation and quotation omitted). "In examining the evidence in the light most favorable to the verdict winner, to reverse the trial court, we must conclude that the verdict would change if another trial were granted." *Id.* "Further, if the basis of the request for a new trial is the trial court's rulings on evidence, then such rulings must be shown to have been not only erroneous but also harmful to the complaining [party]." *Id.* "Evidentiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment[.]" *Id.*

"Moreover, the admission or exclusion of evidence is within the sound discretion of the trial court." *Id.* "In reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law." *Id.*

The Honorable Carol K. McGinley has authored a comprehensive, thorough, and well-reasoned Opinion, with references to relevant facts of record and applicable case law. The record is free of legal error and the evidence supports the court's ruling on the evidentiary issue. After a careful review of the parties' arguments and the record, we discern no abuse of

discretion or error of law and we affirm on the basis of that Opinion. ***See*** Trial Court Opinion, dated 1/31/17, at 8-17 (concluding: (1) Dr. Bykov's testimony was relevant to the standard of care and the knowledge, skill, and care normally exercised in the medical profession; (2) the trial court clearly and properly instructed the jury about the applicable objective standard of care; (3) counsel also emphasized the objective standard of care throughout their closing arguments; (4) Appellant failed to prove prejudice; (5) the cases on which Appellant relied were distinguishable because they pertained to "error of judgment" charges, which was not at issue in this case; and (6) Appellant thus failed to meet her burden to prove that the trial court clearly and palpably committed an error of law that controlled the outcome of the case or constituted an abuse of discretion).

The parties are directed to attach a copy of the trial court's January 31, 2017 Pa.R.A.P. 1925(a) Opinion to all future filings.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/26/2017

- 6 -

Filed 6/5/2017 7:05:00 PM Superior Court Eastern District
1194 EDA 2017

FILED 1/31/2017 3:10:19 PM,Clerk of Judicial Records, Civil Division, Lehigh County, PA
2013-C-3960    /s/L S

IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA
CIVIL DIVISION – LAW

BARBARA A. DAVIS,                          :
                          Plaintiff        :
                                           :
                                           :
          v.                               :
                                           :          NO. 2013-C-3960
                                           :
YURY L. BYKOV, Incorrectly identified as   :
Yury I. Bykov, M.D., VSAS ORTHOPAEDICS,    :
P.C. f/k/a VALLEY SPORTS & ARTHRITIS       :
SURGEONS, P.C.,                            :
                          Defendants       :

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPEARANCES:
                Derek R. Layser, Esquire
                      For Plaintiff

                Kyle N. Thompson, Esquire
                     For Defendants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

OPINION

CAROL K. McGINLEY, J.

Plaintiff Barbara A. Davis (Plaintiff) filed this medical malpractice action asserting that

Defendants Yury L. Bykov, M.D., and VSAS Orthopaedics, P.C. (Defendants) failed to meet the

standard of care in treating Plaintiff's tibia-fibula fracture. A jury trial commenced on

September 27, 2016; on September 29, 2016, the twelve-member jury returned a verdict in favor

*Davis v. Bykov and VSAS Orthopaedics, P.C. f/k/a Valley Sports & Arthritis Surgeons, P.C.*
*Case No.: 2013-C-3960*

of Defendants. Plaintiff filed a motion for post-trial relief on October 7, 2016. Defendants filed

a response, the parties briefed the issues, and argument was held on January 6, 2017.

The relevant facts are as follows:

FACTS

On December 23, 2011, Plaintiff broke her leg while dismounting a horse. She was seen

by Defendant Yury L. Bykov, M.D. (Dr. Bykov) in the emergency department of Lehigh Valley

Hospital. Plaintiff had soft tissue injury as well as a fractured tibia and fibula that required

immediate surgery. Dr. Bykov surgically inserted an intramedullary rod inside the Plaintiff's

tibia bone to stabilize the fracture. Notes of Testimony (N.T.), September 27, 2016, pp. 74-76.

Plaintiff was discharged on December 26, 2011. At the time of discharge, Plaintiff's leg

was casted and she was non-weight bearing. On January 5, 2012, Plaintiff had her first follow-

up visit with Dr. Bykov. At that first visit, x-rays were taken and Plaintiff was assured that her

leg was healing well and appeared to have good alignment. Plaintiff was placed in a fracture

boot to immobilize her leg. Plaintiff remained non-weight bearing following the January 5, 2012

visit. *Id.* at 77.

Plaintiff's next visit with Dr. Bykov was on January 26, 2012. Plaintiff was experiencing

drainage from her leg and scheduled an appointment because she was concerned about a possible

infection. X-rays were taken and reviewed which revealed that the rod was no longer holding

the fracture in place. As a result, additional surgery was necessary to remove the rod which had

displaced through the front of the bone. *Id.* at 27-28, 78-80.

Surgery to remove the rod was conducted the next day on January 27, 2012. Plaintiff

remained in the hospital for several days. She was placed in external fixation with pins sticking

2

*Davis v. Bykov and VSAS Orthopaedics, P.C. f/k/a Valley Sports & Arthritis Surgeons, P.C.*
*Case No.: 2013-C-3960*

out of the front of her leg and the sides of both of her feet. Plaintiff was placed in a wound VAC, a type of pressure dressing, to help heal her skin. Plaintiff was diagnosed with a staph infection while in the hospital and placed on IV antibiotics. Plaintiff had a PICC line inserted in order to receive IV antibiotics at home. Plaintiff had the PICC line for approximately six weeks. In addition, Plaintiff was placed on blood thinners to minimize the risk of blood clots. *Id.* at 29-33.

Plaintiff's stitches were removed on February 9, 2012. On March 6, 2012, the external fixator was surgically removed. Plaintiff was again placed in a cast. *Id.* at 33-34.

On March 20, 2012, Plaintiff had a follow-up visit and was told she could begin to bear weight with the cast as tolerated. On March 29, 2012, Plaintiff had a visit with Dr. Bykov and was put in a fracture boot and was permitted to weight bear and mobilize. *Id.* at 84-85.

Plaintiff met with Dr. Bykov on April 26, 2012; Plaintiff continued to experience pain and there was a bump on her lower leg. Dr. Bykov ordered a CAT scan in May of 2012, to determine if another surgery would be necessary. *Id.* at 87. The CAT scan report stated that there was no healing at the fracture site, meaning the bone didn't heal. Plaintiff did not see Dr. Bykov from May 2012 through November 2012. From May 2012 through September 2013, Plaintiff was able to walk with a limp without the help of any device. *Id.* at 89-90.

After Plaintiff received the May 2012 CAT scan results, she scheduled an appointment at the Rothman Institute in Philadelphia, Pennsylvania. She saw Dr. Pedowitz who referred her to Dr. Raikin. Plaintiff saw Dr. Raikin in July of 2012; as a result of that appointment, Plaintiff believed additional surgery was necessary but not urgent. She continued to have pain and swelling in her leg, and the bump remained the same from May of 2012 to when she returned to Dr. Raikin on August 19, 2013, to schedule additional surgery. *Id.* at 40-45.

3

*Davis v. Bykov and VSAS Orthopaedics, P.C. f/k/a Valley Sports & Arthritis Surgeons, P.C.*
*Case No.: 2013-C-3960*

Dr. Raikin performed surgery on September 24, 2013, at Jefferson University Hospital. After that surgery, Plaintiff was placed in a Taylor Spatial Frame, a double halo external fixation device. *Id.* at 45-47.

In January of 2014, Plaintiff experienced pain and swelling and had an emergency visit with Dr. Raikin. She was taken to the same-day surgery center to have infected pins removed to prevent infection to the bone; different pins were placed in the leg. Plaintiff was not permitted to return to work until the frame was removed because of the risk of infection. *Id.* at 63.

From January 2014 through June 2014, Plaintiff began seeing improvement with the alignment of her foot. She remained on antibiotics and her infection began to clear. The Taylor Spatial Frame was removed on June 3, 2014. After the halo was removed, Plaintiff's foot was placed into a cast for approximately one month.

Currently, Plaintiff experiences occasional pain in her right leg; she moves slower and more cautiously than prior to the fall. A minimal bump remains on her leg along with significant scarring. Plaintiff continues to have intermittent swelling and has areas that are sensitive to the touch. *Id.* at 71-72.

Sanford Davne, M.D., testified as Plaintiff's expert. At the time of trial, Dr. Davne had not performed surgery for approximately 18 years, had never performed orthopedic trauma surgery during his career, and was formerly a spine surgeon. N.T. September 28, 2016, pp. 20-23. Dr. Davne never performed the surgery that Dr. Bykov performed on Plaintiff that placed the intramedullary rod and nails to address the tibia fracture; Dr. Davne never conducted serial x-ray checks as a follow-up to surgically placing such a rod. *Id.* at 26-27.

4

*Davis v. Bykov and VSAS Orthopaedics, P.C. f/k/a Valley Sports & Arthritis Surgeons, P.C.*
*Case No.: 2013-C-3960*

Dr. Davne testified that the films taken on January 5, 2012, revealed that although the alignment was fine and had not changed post-surgery, the fracture was no longer anatomic; the tibia and fibula had shifted and become displaced. In addition, there was a new fracture that could be seen on the films. *Id.* at 57-60. Dr. Davne opined within a reasonable degree of medical certainty that Dr. Bykov failed to meet the standard of care in interpreting the x-rays of January 5, 2012, because he failed to recognize the displacement that had occurred as well as a new fracture line that was present. *Id.* at 63.

Dr. Davne opined that because Dr. Bykov failed to correctly interpret the x-rays, Plaintiff was permitted to begin bearing weight which caused the fracture to become more displaced and heal in an improper position. This caused the bone to poke through the skin which required treatment with intravenous antibiotics. It required placement of an external fixator and additional surgery. *Id.* at 64. Dr. Davne opined that had Plaintiff remained casted for additional time following the x-rays taken on January 5, 2012, the new fracture would have healed.

Dr. Samir Mehta, M.D., testified as Defendants' expert. Dr. Mehta is an orthopaedic trauma surgeon at the University of Pennsylvania. N.T. September 29, 2016, p. 17. Dr. Mehta completed a fellowship in orthopedic trauma at Harborview Medical Center, a level one trauma center that covers 25% of the United States land mass. *Id.* at 20. Dr. Mehta completed a second fellowship in Germany before joining the faculty at the University of Pennsylvania. *Id.* at 22-23. Dr. Mehta has presented novel techniques relating to placement of rods to the faculty and residents at the University of Pennsylvania, including "Avoiding Pitfalls in Intramedullary Nailing" and "Intermedullary Nailing: Tips and Techniques." *Id.* at 29-30. Dr. Mehta completes

*Davis v. Bykov and VSAS Orthopaedics, P.C. f/k/a Valley Sports & Arthritis Surgeons, P.C.*
*Case No.: 2013-C-3960*

surgical repair of tibia-fibula fractures 60-70 times a year and personally reviews the follow-up

imaging of those patients. *Id.* at 39-40.

Dr. Mehta opined that Dr. Bykov met the standard of care in every way. *Id.* at 126-127.

He testified:

> [T]he decisionmaking and the treatment were consistent with what would be
> normally done. In terms of the initial rod placement, the alignment that was
> obtained, the decisionmaking to allow weight bearing, the decision to remove the
> rod and replace with the ex-fix, the decision to remove the ex-fix and stress the
> tibia, the decision to allow progressive weight bearing over time, the frequency of
> x-rays, the frequency of follow-up, the graduated improvement in terms of the x-
> ray findings, all of that makes algorithmic sense, yes.

*Id.* at 124.

When asked if his opinion changed if he were to assume that a new fracture was evident

from the x-rays dated January 5, 2012, Dr. Mehta testified:

> No. Even if this were a new fracture - - let's just say that that's a new fracture
> fragment that maybe was - - maybe it was there from the beginning. Maybe it
> was there on the initial injury film. Maybe when the rod went down, it completed
> the fracture. Maybe, maybe, maybe. You still have an intramedullary device
> that's appropriately sized, appropriate length, with two bicortical screws in the
> bottom of the tibia holding the bottom of the leg relative to the top of the leg; the
> length alignment and rotation on this film are maintained. It doesn't change
> anything.

*Id.*

Defendants also offered expert testimony from Dr. Bykov. Dr. Bykov completed a

fellowship in orthopedic trauma at Duke University, specifically working on patients with

musculoskeletal trauma, including pelvic fractures and fractures related to the arms and lower

extremities. N.T. September 28, 2016, p. 115. He is currently an orthopaedic trauma surgeon at

Lehigh Valley Hospital, a level one trauma center. *Id.* at 116. Dr. Bykov treats patients with

fractures to the tibia and/or fibula multiple times a week; he places rods into tibias to address a

6

*Davis v. Bykov and VSAS Orthopaedics, P.C. f/k/a Valley Sports & Arthritis Surgeons, P.C.*
*Case No.: 2013-C-3960*

fractured tibia approximately every 10-14 days. *Id.* at 119. Dr. Bykov provides the follow-up care with the patients in whom he has surgically placed a tibia rod. *Id.* at 119-120.

Dr. Bykov testified in great detail regarding his treatment of Plaintiff. He testified that throughout the course of treatment he did everything appropriate and met the standard of care. *Id.* at 126, 192, 193. Dr. Bykov disagreed with Dr. Davne's opinion that Plaintiff should have been casted after the rod had been placed. He testified that such treatment is no longer the standard of care:

> The cast used to be used very widely 20, 30 years ago. It is rarely used today. The cast was used because there was no additional stabilization to the fracture. They didn't use a cast with a rod. They didn't use a cast with a plate. They did not use a cast with external fixator. They just had a cast. They had pretty much just one tool in their box. Now we have other tools. This rod supercedes a cast. It provides more stability than a cast. It's more convenient for the patient. It provides more predictable definitive alignment and healing. Less - - with this particular patient, less - - allows more monitoring of soft tissue envelope.

*Id.* at 151.

Dr. Bykov was asked if he failed to intervene in some way on January 5, 2012, after the first post-operative film was taken and reviewed. Dr. Bykov responded that "[e]ven in retrospect, I don't think it was reasonable to do anything different than what I have done." He further testified that he was within the standard of care in removing the external fixator and allowing weight bearing because he gathered enough data, including four x-rays, and he had applied pressure to the fracture without incident while Plaintiff was under anesthesia. *Id.* at 193.

Dr. Bykov further confirmed that when he cared and treated Plaintiff, he brought to "bear all of [his] education, training, experience and [did] so to the best of [his] ability." He also brought to "bear that orthopedic trauma fellowship, [his] experience in dealing with tibia

7

*Davis v. Bykov and VSAS Orthopaedics, P.C. f/k/a Valley Sports & Arthritis Surgeons, P.C.*
*Case No.: 2013-C-3960*

fractures, [his] knowledge of rods and relative stability and [applied] those concepts to the best of [his] ability as a doctor." *Id.* at 224-225.

## DISCUSSION

Plaintiff asserts in her motion for post-trial relief that this court erred in allowing Dr. Bykov to testify as to an improper standard of care, which resulted in prejudice to Plaintiff. Plaintiff requests a new trial.

The Pennsylvania Supreme Court has enunciated a two-step process in reviewing a motion for new trial at the post-trial level in *Harmon v. Borah,* 562 Pa. 455, 756 A.2d 1116 (2000). First, the court must decide whether or not one or more mistakes occurred at trial. Secondly, if a mistake did occur, the court must determine if the mistake constituted a sufficient basis for granting a new trial under the harmless error doctrine. *Id.* at 1122.

When evidentiary rulings are at issue, a trial court's decisions as to those rulings are "controlled by the sound discretion of the trial court." *Sutherland v. Monongahela Valley Hospital,* 856 A.2d 55, 59 (Pa. Super. 2004). Those rulings should not be disturbed at either the post-trial or appellate levels unless a clear abuse of discretion is demonstrated. *Id.* Accordingly, the standard of review in assessing an evidentiary ruling of a trial court is "extremely narrow" and may be only reversed upon a showing of manifest abuse of discretion. *King v. Stefenelli,* 862 A.2d 666, 675 (Pa. Super. 2004); *Eichman v. McKeon,* 824 A.2d 305, 319 (Pa. Super. 2003). "An abuse of discretion exists when the trial court renders a judgment that is manifestly unreasonable, arbitrary or capricious, fails to apply the law or is motivated by partiality, prejudice, bias or ill will." *Daddona v. Thind,* 891 A.2d 786, 799 (Pa. Cmwth. 2006).

8

*Davis v. Bykov and VSAS Orthopaedics, P.C. f/k/a Valley Sports & Arthritis Surgeons, P.C.*
*Case No.: 2013-C-3960*

Plaintiff asserts that this court erred as a matter of law because Dr. Bykov was permitted to testify on redirect examination as to a subjective standard of care. The testimony at issue is as follows:

[BY MR. THOMPSON:]

Q      Doctor, did you do your best for this patient?
       MR. LAYSER: Objection.
       THE COURT: The objection's sustained because - -
       MR. THOMPSON: I'm going - - I'll rephrase it.
       THE COURT: Yes.
       MR. THOMPSON: Doctor - -
       THE COURT: I was going to explain to the jury why it's not allowed. But go ahead, rephrase it and maybe it will take care of it.

BY MR. THOMPSON:

Q      Doctor, when you cared for this patient, did you bring to bear all your education, training, and experience and do so to the best of your abilities?
       MR. LAYSER: Objection.
       THE COURT: Overruled.

BY THE WITNESS:

A      I have.

Q      And when you treated this patient, did you bring to bear that orthopedic trauma fellowship, your experience in dealing with tibia fractures, your knowledge of rods and relative stability, and apply those concepts to the best of your ability as a doctor?
       MR. LAYSER: Objection.
       THE COURT: Over - -
       MR. LAYSER: Can we be heard on this?
       THE COURT: No. Overruled. The witness can answer the question.

BY THE WITNESS:

A      I have.

N.T., September 28, 2016, pp. 223-225.

9

*Davis v. Bykov and VSAS Orthopaedics, P.C. f/k/a Valley Sports & Arthritis Surgeons, P.C.*
*Case No.: 2013-C-3960*

After the jury was dismissed for the day, the following discussion took place regarding the court's earlier ruling on Plaintiff's objection:

MR. LAYSER: On the redirect, my objections to the questions about him doing his best and bringing to bear all that he had and all of his education and training and experience; I objected to that because the issue in the case is whether or not he complied with the standard of care, not whether or not he did his own individual best.

THE COURT: No, I understand that.

MR. LAYSER: But that testimony was allowed, and I request a curative instruction on that, if not tomorrow, during the charge.

THE COURT: The charge will tell them what's important. You can argue to the jury. You may argue to the jury that whether or not he did his best is not the issue. I'm not going to argue that to the jury. But I think that someone in his position should be allowed to say that.

MR. LAYSER: But that's where we disagree; because the issue is whether or not he complied with the standard of care, not whether or not he did his best.

THE COURT: Well, you objected - -

MR. LAYSER: If I do my best but still run through the red light, I'm still negligent.

THE COURT: That's right. That's true.

MR. LAYSER: So to say - - for him to say I did my best is irrelevant and not the issues in the case.

THE COURT: And is it prejudicial to you?

MT. LAYSER: Yes.

THE COURT: Well, I don't think so, not if I allow you to argue it to the jury. So we agree to disagree on that, but I'm the one who has the last word. Unless you can show me a case tomorrow that says that he - - that I shouldn't have let him do that. If you want to come in with a case in the morning, I'll instruct the jury accordingly.

10

*Davis v. Bykov and VSAS Orthopaedics, P.C. f/k/a Valley Sports & Arthritis Surgeons, P.C.*
*Case No.: 2013-C-3960*

*Id.* at 235-237.

The objection was further addressed the next morning without jurors present:

MR. LAYSER: And that note cites *D'Orazio v. Parlee*. And then the *Pringle v. Rapaport* case. *Pringle* is 980 A.2d 159 and that's - - I think *Passarello* just affirms *Pringle* - -

...

THE COURT: Well, that case holds that in that particular case it was error to instruct the jury on mere mistake of judgment.

MR. LAYSER: Right. But there is a long discussion in the case that - - of Pennsylvania law regarding that the standard of care is an objective standard and it applies to the physician's conduct, not the physician's subjective nature of whether he did his best. And as the comment in - - to standard jury instruction 14.10 notes, it is not - - the questions are not to be phrased for the defendant as on - - as is his state of mind. It's an objective standard. So to say that he did his best is improper and it's contrary to Pennsylvania law.

That's been the law as far back as 2004. Counsel's a very experienced defense medical malpractice lawyer; his firm does nothing but med mal defense. And based on those questions which he was allowed to ask, not only that he did his best, but also that he brought to bear everything in his training and experience which is still subjective. After review last night, I'm moving for a mistrial.

THE COURT: Oh, for heaven's sake.

MR. LAYSER: You asked at the end of the day if we were prejudiced. And I - - given the case law, plaintiff was severely prejudiced by the defendant to come up and answer a series of questions on - -

THE COURT: All right. What's the - - what is the jury instruction number that you're talking about?

MR. LAYSER: 14.1 - - 14.10.

THE COURT: Okay. Which says I'm not to give a mistake in judgment case. All right. Hold on. I'm going to read it.

Well, the instruction to the jury does say that you are to be up to date and to know everything you're supposed to know, right?

MR. LAYSER: That's part of the standard of care, but it's still an objective standard of care.

11

*Davis v. Bykov and VSAS Orthopaedics, P.C. f/k/a Valley Sports & Arthritis Surgeons, P.C.*
*Case No.: 2013-C-3960*

THE COURT: Right.

MR. LAYSER: But to say he did his best, even to be asked that question which is clearly improper goes to a subjective state of mind which is not the issue.

THE COURT: Okay. Hold on. Let me continue to read. This is a very long note.

Okay. Here it is. Well, I'm not going to instruct the jury that it's okay that he did his very best.

MR. LAYSER: But the very issue that they are to decide, the focus is whether his actions - -

THE COURT: Absolutely. Absolutely. And that's how I'm going to instruct them and that's how you're going to argue it to them.

MR. LAYSER: But there's now in evidence that he did his best. A juror might say he's a very nice guy, he did his best, how are we going to fault him for doing his best?

THE COURT: I don't think asking - - answering that question is a problem.

Do you - - you want to have this whole case ride on that, Mr. Thompson, or do you want me to instruct the jury that - - how strongly do you feel about keeping that in the case? When I give the standard of care instruction, I can tell them that it doesn't matter that he believes he did his best, you have to judge it on other things. And that will take care of the whole problem; we don't have to talk about it anymore. It's up to you.

MR. THOMPSON: I'm pausing because I'm trying to understand my options. Is it that the Court's proposing a modification to the standard of care instruction as a curative instruction versus just instructing as to the standard of care?

THE COURT: Yes.

MR. THOMPSON: Can I have a minute to talk to my client?

The COURT: Of course maybe if I do that, maybe if I clarify - - maybe if I clarify that his effort is not relevant, perhaps I should also charge the jury that the result is not relevant either except - - not that it's not relevant. A bad result does not mean that there was mal - - it's the - -

12

*Davis v. Bykov and VSAS Orthopaedics, P.C. f/k/a Valley Sports & Arthritis Surgeons, P.C.*
*Case No.: 2013-C-3960*

MR. THOMPSON: The *Hamil Bashline*.

THE COURT: The *Hamil Bashline* instruction. That would take care of both of it, wouldn't it?

MR. LAYSER: I think the prejudice is out there. I'm still moving for a mistrial.

THE COURT: Your motion is denied. That - - that's just the silliest thing I ever heard. We've put four days into this case. The fact - - if I can cure this with - - first of all, I don't necessarily agree with you that it's error. Secondly, if it is error, I don't think it's that prejudicial. And, thirdly, if I cure it with a - - an instruction during the jury instructions, it's fine.

MR. THOMPSON: Your Honor, I looked briefly at the error in judgment case law cited by the plaintiff's counsel. And, granted, I just skimmed it. I don't believe that case law stands for the propositions plaintiff is putting forth before the Court.

The negligence instructions indicate that physician must act as a reasonably prudent physician under the circumstances. The questions were aimed at supporting evidence that he acted as a reasonably prudent physician would under the circumstances in bringing to bear his expertise in judgment. It's that that he - - and the corollary to that is by doing so, he was not careless or negligent.

So that's why I believe it was proper questioning. And it's properly in the case, and I don't want a curative instruction by way of jury instruction that takes it out of the case because that's after testimony's submitted, after we're finished this case, and I'm afraid the jury may then place undue weight on that.

THE COURT: All right. I'll stay with it then. You asked the question. You're taking the risk. You don't want a curative instruction. I won't give it. But I will, of course, give the standard instruction on negligence, and - - on professional negligence...

N.T., September 29, 2016, pp. 8-14.

The Superior Court has stated the following regarding the requirement for expert

testimony in medical malpractice lawsuits:

One of the most distinguishing features of a medical malpractice suit is, in most cases, the need for expert testimony, which may be necessary to elucidate complex medical issues to a jury of laypersons. In other words, "[b]ecause the negligence of a physician encompasses matters not within the ordinary knowledge

13

*Davis v. Bykov and VSAS Orthopaedics, P.C. f/k/a Valley Sports & Arthritis Surgeons, P.C.*
*Case No.: 2013-C-3960*

and experience of laypersons[,] a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury." [*Toogood v. Owen J. Rogal, D.D.S., P.C.*, 573 Pa. 245, 824 A.2d 1140, 1145 (2003).]

> The expert testimony requirement in a medical malpractice action means that a plaintiff must present medical expert testimony to establish that the care and treatment of the plaintiff by the defendant fell short of the required standard of care and that the breach proximately caused the plaintiff's injury. Hence, causation is also a matter generally requiring expert testimony.

*Id.* Indeed, "a jury of laypersons generally lacks the knowledge to determine the factual issues of medical causation; the degree of skill, knowledge, and experience required of the physician; and the breach of the medical standard of care." *Id.* at 1149.

*Grossman v. Barke*, 2005 Pa. Super 45, 868 A.2d 561, 566–67 (2005).

The objective standard for professional negligence actions is whether the physician's conduct violated the standard of care, which in Pennsylvania "centers on the knowledge, skill, and care normally possessed and exercised in the medical profession." *Pringle v. Rapaport*, 980 A.2d 159, 194 (Pa. Super. 2009) (*en banc*).

The 2015 Pennsylvania Civil Jury Instructions offer the following proposed instructions to jurors for the standard of care in medical malpractice cases:

> A physician must have the same knowledge and skill and use the same care normally used in the medical profession. A physician whose conduct falls below this standard of care is negligent.
>
> [*Use the following where the defendant-physician is a specialist:*] [A physician who professes to be a specialist in a particular field of medicine must have the same knowledge and skill and use the same care as others in that same medical specialty. A specialist whose conduct does not meet this professional standard of care is negligent.]
>
> [Under this standard of care, a][A] physician must also keep informed of the contemporary developments in the medical profession [or his or her specialty] and must use current skills and knowledge. In other words, a physician must have up-to-date medical skills and knowledge, and if he or she fails to keep current or fails to use current knowledge in the medical treatment of the patient, the physician is negligent.

14

*Davis v. Bykov and VSAS Orthopaedics, P.C. f/k/a Valley Sports & Arthritis Surgeons, P.C.*
Case No.: 2013-C-3960

Pa.S.S.J.I. (Civ.) § 14.10 (2015).

Dr. Bykov testified as an orthopedic trauma surgeon and expert in his field. He testified

that he used his "education, training, and expertise" to care for Plaintiff to the best of his ability.

N.T. September 28, 2016, p. 224. Such testimony was relevant and admissible to establish that

Dr. Bykov, a defendant-physician orthopedic trauma surgeon, had the same knowledge and skill

as other orthopedic trauma surgeons and that he used the same care as other orthopedic trauma

surgeons.

Dr. Bykov further testified that he used his orthopedic trauma fellowship, experience in

dealing with tibia fractures, and knowledge of rods and relative stability and applied those

concepts to the best of his ability in treating Plaintiff. *Id.* at 224-225. Such testimony was also

relevant and admissible to establish that Dr. Bykov kept informed of the contemporary

developments in orthopedic trauma surgery and used current skills and knowledge in treating

Plaintiff. For this reason, the questions asked by defense counsel were properly permitted to

elicit admissible testimony.

Moreover, any potential confusion by the "best of his ability" testimony was cured

because the jury was told numerous times that Dr. Bykov was required to act within the required

objective standard of care.

For instance, Plaintiff's counsel addressed the standard of care in his closing argument.

He argued, "Dr. Bykov said yesterday he did his best. Ladies and gentlemen, his best wasn't

good enough. That was not the standard of care." N.T., September 29, 2016, p. 170. He further

argued:

> Very shortly, you're going to get instructed on the law by the Court. And
> if I define something different than Judge McGinley, Judge McGinley controls.

15

*Davis v. Bykov and VSAS Orthopaedics, P.C. f/k/a Valley Sports & Arthritis Surgeons, P.C.*
*Case No.: 2013-C-3960*

But you're going to have three questions to answer on a verdict sheet. The first question is was Dr. Bykov negligent? Being a physician, there's a standard of professional negligence. She's going to describe that to you. If you don't act with the standard of care in accordance with other physicians under similar circumstances, you're negligent. And Dr. Davne explained to you what needed to be done and what happened as a result.

*Id.* at 170-171.

Plaintiff's counsel continued, "Dr. Bykov's responsibility on 1/5 was to compare those x-rays, was to see that change which is obvious, and to act upon it. He didn't. He failed to meet the standard of care. And because of that, he's responsible for that harm." *Id.* at 180.

Furthermore, the jurors were properly instructed on the objective standard of care they were sworn to apply. Specifically, they were charged with the following:

Now, what is meant by negligence in the first question? Professional negligence consists of a negligent, careless, or unskilled performance by a physician of the duties imposed on him by the professional relationship with a patient. It is also negligence when a physician shows a lack of proper care and skill in the performance of a professional act. A physician must have the same knowledge and skill and use the same care normally used in the medical profession. A physician whose conduct falls below the standard of care is negligent. A physician who professes to be a specialist in a particular field of medicine must have the same knowledge and skill and use the same care as others in that same medical specialty. A specialist whose conduct does not meet this professional standard of care is negligent.

Under this standard of care, a physician must be kept informed of contemporary developments in the medical profession or his specialty and must use current skills and knowledge. A physician must have up-to-date medical skills and knowledge, and if he fails to keep current or fails to use current knowledge in the medical treatment of the patient, the physician is negligent.

*Id.* at 218-219.

The testimony at issue was relevant pursuant to the above jury instruction. In addition, the above jury instruction demonstrates that the jury was properly charged with the correct standard of care required to determine whether Defendants' treatment of Plaintiff was negligent.

16

*Davis v. Bykov and VSAS Orthopaedics, P.C. f/k/a Valley Sports & Arthritis Surgeons, P.C.*
*Case No.: 2013-C-3960*

Finally, Plaintiff suffered no prejudice as a result of Dr. Bykov's testimony. Plaintiff's reliance on *Pringle v. Rapaport*, 2009 Pa. Super. 171, 980 A.2d 159 (2009), and *Passarello v. Grumbine*, 624 Pa. 564, 87 A.3d 285 (2014), to support her prejudice argument is misplaced; the prejudice in the above-mentioned cases was a result of the "error of judgment" charge that was given to the jury. The "error of judgment" charge was not given in this case. The jurors were instructed as to the proper standard of care and Plaintiff suffered no prejudice.

Plaintiff's Motion for Post-Trial Relief and request for a new trial is denied.

DATE:

*January 31, 2017*

BY THE COURT:

CAROL K. McGINLEY, J.

17